**Opinion issued December 31, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-23-00079-CV**

———————————

**TWC AVIATION, INC. D/B/A LANDMARK AIRCRAFT
MANAGEMENT & CHARTER – SJC, Appellant**

**V.**

**WORLD TECH AVIATION, LLC, Appellee**

**On Appeal from the 215th District Court
Harris County, Texas
Trial Court Case No. 2017-33283-7**

# O P I N I O N

Appellant, TWC Aviation, Inc., doing business as Landmark Aircraft

Management & Charter – SJC ("Manager"),[1] challenges the trial court's judgment,

---

[1] On January 1, 2017, TWC Aviation, Inc., doing business as Landmark Aircraft
Management & Charter – SJC, was purchased by GAMA Aviation, LLC

entered after a bench trial, in favor of appellee, World Tech Aviation, LLC ("World Tech"), in World Tech's suit against Manager for breach of contract, conversion, and violation of the fraudulent lien statute and Manager's countersuit against World Tech for breach of contract and foreclosure of its lien. In four issues, Manager contends that trial court erred in granting World Tech's motion for partial summary judgment and declaring that Manager did not possess a valid lien on the aircraft; the evidence is legally insufficient to support the trial court's findings that Manager's actions caused World Tech actual damages and that Manager was liable for conversion and violation of the fraudulent lien statute; and the evidence conclusively established that Manager was entitled to recover on its breach-of-contract counterclaim against World Tech.

We affirm in part, reverse in part, render in part, and remand in part.

## Background

World Tech entered an aircraft services agreement (the "services agreement") with Manager in April 2016, under which Manager agreed to manage certain maintenance tasks on World Tech's aircraft in exchange for World Tech's payment of a management fee and reimbursement of maintenance, fuel, and other operational

---

("GAMA"). This change of ownership is not relevant to the legal issues raised in this appeal. For consistency and ease of reference, we will refer to both TWC Aviation, Inc., doing business as Landmark Aircraft Management & Charter – SJC, and GAMA as "Manager."

2

costs.  Manager agreed to send World Tech a monthly "itemized statement of [its] account," showing the fees that World Tech had incurred "through the end" of the "prior calendar month."  World Tech, in turn, was required "pay to [Manager] an amount equal" to any "net debit balance" reflected on the account "within thirty (30) days" of its receipt of an "itemized statement."  If World Tech disputed "any of the charges listed on a particular statement," it was required to:

> (i) promptly notify [Manager] of such dispute; (ii) pay undisputed amounts within thirty (30) days of receipt of such itemized statement; and (ii[i]) negotiate a resolution of the dispute with [Manager] as soon as possible, but no later than ten (10) [b]usiness [d]ays after the expiration of the thirty (30) day period in which to pay undisputed amounts.

If any payment owed on World Tech's account was past due, Manager "reserve[d] the right, upon notice to client, to temporarily suspend any and all services" that it owed World Tech under the services agreement.

In a separate paragraph, entitled "Breach of Payment Obligations," the services agreement further declared that:

> [F]ailure to pay any sum due to [Manager] within ten (10) days of the due date shall be a breach of contract.  In the event of such breach, [Manager] shall not be obligated to provide more than one (1) notice of breach during any twelve (12) month period for any instance of [World Tech] failing to pay any amount, when due, to [Manager].  All sums past due will bear interest of (1.5%) per month (or the maximum amount allowed by applicable law), plus [World Tech] shall be liable for all reasonable attorney fees, and other costs of collection.

3

If the parties otherwise terminated the services agreement, Manager was to send World Tech "a final itemized accounting statement of all [c]harter fees, [c]osts and [e]xpenses, [o]perating [c]osts, [i]ncidental [e]xpenses, and [h]angar [f]ees" within sixty days after termination. "Payment of any net balance or net credit balance indicated in such final statement [was to] be paid by the owing party to the other party within ten (10) days of the date of the final itemized accounting statement." World Tech was also entitled to a refund of its deposit at termination, "[s]o long as (i) no event of default exist[ed], (ii) Manager [was] paid in full, and (iii) such [d]eposit ha[d] not already been applied to amounts due from [World Tech] under th[e] [services] [a]greement."

Manager and World Tech also executed a charter and lease agreement, under which World Tech agreed to "[d]ry [l]ease[2] the aircraft to Manager and Manager agreed to [d]ry [l]ease the [a]ircraft from [World Tech]." Under the charter and lease agreement, Manager had the right to "use and operate the [a]ircraft to conduct [charter] [o]perations from time to time when the [a]ircraft [wa]s not otherwise in use by [World Tech]." The arrangement contemplated that World Tech would schedule its own use of the aircraft, and Manager would schedule use of the aircraft

---

2     *See* 14 C.F.R. § 91.1001(b)(2) ("A dry-lease aircraft exchange means an arrangement, documented by the written program agreements, under which the program aircraft are available, on an as needed basis without crew, to each fractional owner.").

for charter flights so that the times scheduled for use did not conflict. The charter and lease agreement also provided that World Tech would be paid "$3,570[] per actual flight hour" of a charter operation, a fee that could be adjusted by Manager, with World Tech's approval, "based upon market conditions."

The charter and lease agreement also specified other financial conditions. As to charter flights, the agreement made clear that World Tech was not involved in, and Manager was "solely responsible for[,] billing and collecting payment from [c]harter [c]ustomers" as well was for handling charges and reimbursements "for catering, customs, ground transportation," and other fees associated with the charter flights. As to World Tech's use of the aircraft, the charter and lease agreement specified that "[a]ll [o]perating [c]osts and [i]ncidental [e]xpenses incurred by [Manager]" on behalf of World Tech would be "charged to [World Tech's] account."

The services agreement and the charter and lease agreement both contained choice-of-law provisions reciting that the agreements were "negotiated and delivered in the State of Texas" and would "in all respects be governed by, and construed in accordance with, the laws of the State of Texas, including all matters of construction, validity, and performance, without giving effect to its conflict of laws provisions." Both agreements also contained "no waiver" provisions stating that:

> No delay or omission in the exercise or enforcement of any right or remedy hereunder by either party shall be construed as a waiver of such

5

right or remedy. All remedies, rights, undertakings, obligations, and agreements contained herein shall be cumulative and not mutually exclusive, and in addition to all other rights and remedies which either party possesses at law or in equity.

In its amended petition, World Tech alleged that under its agreements with Manager, it "was to receive a portion of the charter revenue and would also reimburse [Manager] for maintenance, fuel, and other operational costs paid by [Manager]." Pursuant to the agreements, "[Manager] had possession of both the [a]ircraft and [its] maintenance records." According to World Tech, "[Manager] failed to timely and accurately provide monthly accounting" and records of the aircraft's operation. Further, Manager "failed to properly maintain the [a]ircraft" or "generate charter revenue" as promised.

World Tech alleged that the agreements terminated on April 13, 2017, when Manager "took possession of the [a]ircraft." When World Tech "requested that Manager return the [a]ircraft maintenance records" at the time, Manager refused to do so. Manager also refused to "allow [Manager] to inspect and/or copy those records as provided for in the [a]greement[s]." In June 2017, Manager filed "a lien against the [a]ircraft with the Federal Aviation Administration" ("FAA") and claimed an aircraft mechanic's lien under the Texas Property Code, alleging "that it [wa]s owed for expenses" that it had "incurred or paid on behalf of [World Tech] pursuant to the [a]greement[s]."

6

World Tech brought a claim against Manager for breach of contract, asserting that Manager's "non-performance constitute[d] a breach of contract," as did its withholding of the aircraft maintenance records, which prevented World Tech from chartering the aircraft. Those breaches caused World Tech to "incur[] damages, including consequential damages and lost profits." World Tech also alleged a claim for conversion based on Manager's "withholding of the [a]ircraft maintenance records." Further, World Tech brought a claim for violation of the fraudulent lien statute, and it requested that the trial court "declare the lien claimed by [Manager] void," arguing that Manager's lien asserted was invalid because Manager did not qualify . . . as a provider of fuel or repairs and thus [wa]s not entitled to a mechanic's lien" under the Texas Property Code.

As to damages, World Tech sought "consequential damages and lost profits." It also sought exemplary damages based on its conversion claim, alleging that Manager's "conversion of the property . . . was malicious in that [Manager] specifically intended to cause substantial injury to [World Tech]."

Manager answered, generally denying the allegations in World Tech's petition. Manager also brought counterclaims against World Tech for breach of contract and foreclosure of its lien. Manager alleged that it had "provided the services set forth in the [a]greement[s] to World Tech" until "[t]he [a]greement[s] w[ere] terminated on April 13, 2017." On that date, "World Tech owed [Manager]

7

$135,043.19 for fuel, $70,549.72 for maintenance, and $38,400 for storage," making "[t]he cumulative balance due including interest minus a credit for the unused portion of the [o]perating [d]eposit paid to [Manager] . . . $249,249.90," an amount that World Tech had "failed to pay." As to damages for its breach-of-contract counterclaim, Manager sought to recover that sum "plus interest." Further, "[a]s a result of World Tech's failure to pay" the amount due under the agreements, Manager asserted that it "became entitled," under Texas law, to place a statutory "[c]laim of lien against the [a]ircraft at the [FAA]," and it sought to foreclose on its asserted lien.

After the parties reached an agreement that World Tech would deposit funds into the court's registry in exchange for Manager's release of the aircraft's maintenance records, the trial court signed an October 26, 2018 agreed order allowing World Tech to deposit $175,000 into the registry of the court.

World Tech then filed a motion for partial summary judgment against Manager, arguing that it was entitled to summary judgment as a matter of law on Manager's counterclaim for foreclosure of its lien because "Texas law regarding aircraft mechanic's liens [did] not apply to [Manager]'s alleged lien" as (1) "there [wa]s no nexus between the [p]arties and Texas," (2) Manager was only a management company that did not actually perform maintenance or provide fuel,

and (3) "[Manager] failed to file a notarized lien" as required under Texas Property Code section 70.301(a).

In response to World Tech's partial-summary-judgment motion, Manager argued that World Tech was not entitled to summary judgment on its counterclaim for foreclosure of its lien because "[Manager] ha[d] a valid lien on [World Tech]'s aircraft and therefore [World Tech] [wa]s not entitled to quiet title to the aircraft" or "there [wa]s a genuine issue of material fact as to whether [Manager]'s lien on the aircraft [wa]s valid and therefore whether [World Tech was] entitled to quiet title to the aircraft."

The trial court granted World Tech's motion for partial summary judgment on Manager's counterclaim for foreclosure of its lien. In its order, the trial court declared that Manager "d[id] not possess a valid mechanic's lien against [the aircraft]" and Manager's "claimed June 12, 2017 [m]echanic's [l]ien against the [a]ircraft [wa]s null and void." Based on its declaration, the trial court dismissed Manager's counterclaim for foreclosure of its lien.

In the bench trial on the remaining claims and counterclaim, Kevork Kouyoumjian testified that in 2001, he started World Tech Toys, a toy manufacturing business. The company had an office and warehouse distribution facility in Valencia, California that employed about seventy people.

9

In 2016, World Tech Toys, through its subsidiary, World Tech, bought a private jet (the "aircraft") for $2 million. Kouyoumjian planned to use the aircraft for business purposes and to "charter it out" to "get revenue" and thereby help to offset aircraft-related expenses.

Kouyoumjian had discussions with Manager about having it manage and charter the aircraft. Manager informed World Tech that it "would get about 330 hours of charter per year while [Manager] took care of the air[craft]" at a separate price of about $135 an hour. After Michael Long, an aircraft salesman and broker, "helped [World Tech] find" the aircraft, then helped World Tech purchase the aircraft, Manager and World Tech entered "a contract for management and for chartering the [aircraft]." Pursuant to the contract, World Tech paid Manager a $50,000 deposit.

According to Kouyoumjian, under the contract, Manager agreed to "maintain the [a]ircraft in airworthy condition." The contract also provided that both World Tech and Manager would have "reasonable access" to the aircraft's "annual books, logbooks, records and work orders . . . , including the [a]ircraft documents, for inspection, auditing, and copy[ing] during the term and period ending two years after termination of th[e] [contract]."

Kouyoumjian noted that Manager had some problems with its maintenance of the aircraft. In March 2017,[3] the struts, which were part of the aircraft's landing gear, were "over-service[d]." The struts had been adjusted "too high," which "caused the [aircraft] to lose control for about four seconds when the pilot landed." This problem caused World Tech to "miss[] out" on two charters. Kouyoumjian sent an email to Thomas Connelly, Manager's Chief Executive Officer ("CEO"), about the problems with the missed charters. He told Connelly that World Tech wanted "charter credit" of $33,000 and to have the charges for servicing the struts "credited back" to World Tech. Connelly responded that if World Tech brought its account current by the following week, Manager would give World Tech the credit that it requested.

Kouyoumjian, though, had "multiple issues" with Manager's billing. He "would not get invoices by the 15th or for a few months." And he would receive "bills that ha[d] nothing to do with [the aircraft]." They would be for "other people's air[crafts], other people's tail numbers, other people's fuel charges," and "other people's maintenance." Kouyoumjian complained about the inaccurate billing "over three times directly" to Connelly and Manager's accountant. Kouyoumjian also

---

[3]    On January 1, 2017, TWC Aviation, Inc., doing business as Landmark Aircraft Management & Charter – SJC, was purchased by GAMA.

11

noted that he had had trouble receiving Manager's invoices because they were sent as email attachments and were "too large to go through."

Kouyoumjian recounted that because of the problems caused by Manager's accounting errors and the maintenance error that caused the loss of two charter flights, Connelly had offered to waive Manager's $5,000 monthly management fee for January, February, and March of 2017 and credit World Tech for $32,000 in lost charter revenue in an effort to regain World Tech's trust.

After that, though, Manager's accountant mistakenly sent World Tech copies of erroneous invoices a third time. Kouyoumjian noted that the invoices did not reflect the waiver of Manager's management fees or the $32,000 credit for the lost charter revenue.

On March 20, 2017, Kouyoumjian sent an email to Connelly notifying him that World Tech was "disputing the invoices." Kouyoumjian informed Connelly that "after over a year with [Manager]," World Tech still "d[id] not have all the invoices." And he told Connelly that "[e]ven last week," he received an invoice for "another [a]ircraft[]" from Manager that "stat[ed] it was [World Tech's]."

Connelly then sent Kouyoumjian an email on March 21, 2017, informing him that World Tech "need[ed] to approve or dispute any particular items [that it] disagree[d] with" on the invoice and "get [its] account current." Further, noting the extent to which the parties' relationship had deteriorated, Connelly suggested that

12

World Tech have its "attorney contact John Tesei," Manager's general counsel, the following day to arrange "to get [World Tech] to another management company without delay."

On April 3, 2017, Kouyoumjian received an email in which Connelly offered to give World Tech the requested credits if Kouyoumjian agreed to bring its account current by the following week. Kouyoumjian responded, "[W]e can work that out." He also inquired whether Manager, which had recently undergone a change in ownership, would "be interested in keeping [World Tech] as a hang[a]r tenant." Kouyoumjian noted that World Tech was "not getting any charter[s] or services" that it wanted, and he estimated the charter revenues were short by about $200,000. "[M]inus [$]33,000 for the charter" and World Tech's "$50,000 deposit," Kouyoumjian estimated that World Tech owed Manager "around [$]120,000." "Whatever the number [wa]s after that," World Tech was waiting for a "full account[ing]."

Kouyoumjian requested that Manager send the invoices by express delivery. When he did not receive a response, he sent Connelly a follow-up email. Kouyoumjian acknowledged that after that communication, he received an express delivery package from Manager with all the invoices. After receipt of the invoices, World Tech wired a $135,000 payment to Manager on April 10, 2017. After World Tech made that payment, it had a personal flight going to New York. Connelly

"allowed the [aircraft] to go" to New York. But after it arrived in New York and "the pilots [had] deplaned the aircraft," Manager "t[ook] the air[craft], tuck[ed] it away in one of [Manager's] hang[a]rs," and would not "release it back to [World Tech]." Manager also cancelled the credit cards that the pilots used for food and accommodations. And Manager cancelled the insurance on the aircraft, so it could not be flown back to California.

Kouyoumjian "called the airport police" and reported what had happened. A few hours later, the aircraft's lead pilot called him to let him know that the "airport police" had helped the flight crew "get the [aircraft] back out of the hangar." World Tech thus regained possession of the aircraft. But Manager refused to return the aircraft's maintenance records to World Tech when the contract terminated because, according to Manager, World Tech still owed money on its account.

Kouyoumjian acknowledged receipt of an email from Connelly noting Kouyoumjian's April 3, 2017 agreement "to pay [Manager] in full" for all the invoices prior to March 2017, which amounted to approximately $288,000, and World Tech's payment of only $135,000 of the agreed amount. Connelly had stated in his email that the situation was "unacceptable" and informed Kouyoumjian that Manager would "not continue to pay any fixed cost" and that "[e]ffectively immediately," Manager would "remove the pilots from [World Tech's] account and plac[e] them on unpaid leave, pending the resolution of [World Tech's] accounts

with [Manager]." Further, Connelly told Kouyoumjian that the aircraft would "be placed on ground insurance only" and "w[ould] not be moved or flown until [World Tech's] account [wa]s paid in full." Alternatively, if World Tech "wish[ed] to settle all the charges," Manager would have the aircraft made available for pickup by a World Tech representative.

Kouyoumjian responded in an email to Connelly on April 12, 2017, noting that World Tech had paid until March and that Manager still had World Tech's $50,000 deposit and still owed World Tech "the [$]33,000 credit." Kouyoumjian denied owing Manager $288,000. He stated that World Tech was still "disputing [Manager's] excessive billing and [its] over-servicing [of the aircraft]."

Kouyoumjian further testified that World Tech ultimately "hired a forensic[] accountant" to review Manager's billings "line by line[] and come up with the number" that World Tech actually owed. The forensic accountant determined that World Tech still owed Manager "[a]bout $178,000."

Tesei testified that he was the general counsel for Manager from 2008 to 2019. A few weeks after World Tech filed its lawsuit against Manager, Tesei signed a "Mechanic's or Materialman's Lien Statement" stating that Manager had a "claim against [World Tech]" in the sum of $249,249.90 for "storage, fueling, repair, or maintenance" services which were furnished to World Tech for the aircraft pursuant to contract. Tesei explained that Manager filed the lien with the FAA to protect its

rights as to the "substantial credit" it had extended to World Tech. Tesei later learned that the FAA did not accept the filing of the lien.

Connelly testified that he was the President and CEO of Manager and was a licensed aircraft mechanic and pilot. He acknowledged that the services agreement with World Tech provided that both parties were entitled to access to the aircraft maintenance records for inspection and copying purposes for up to two years after the services agreement terminated. He also acknowledged that the aircraft had to have a copy of the maintenance records in order to provide charter services. But he refused to return the aircraft maintenance records to World Tech or allow World Tech to inspect or copy those records.

Karl Thomas testified that he was a certified public accountant with over thirty years' experience and a commercial pilot. In preparing his report for World Tech, he reviewed emails, invoice records, and the parties' agreements. He calculated that the amount that World Tech should have paid to bring its account current was $254,551.64. World Tech's payment of $135,000 did not bring its account current.

Sheryl Smith testified that she was Manager's Chief Financial Officer from 2016 to 2017. Manager would "receive invoices related to operating the [a]ircraft" every day. They would go to the accounts payable department, where they "would be properly coded to identify the [a]ircraft that they relate[d] to." Smith would review the invoices, and "[a]t the end of the month, all the expenses related to that

16

individual [a]ircraft would be combined, reported on a summary" for the client. "And all of the supporting invoices for the overall statement, would also be foliated and attached so it would be one PDF document at the end of the month that would be prepared and sent to the client."

Smith was never made aware that World Tech had ever disputed any specific line item of expense in any statement sent to it. She did see one instance, in March 2017, in which World Tech was sent an invoice that pertained to another client's aircraft. It was "clearly a mistake" made by the accountant who attached it to the email. Smith agreed that World Tech would have seen when the email was opened that it was an invoice for "Diamond, LLC" and not World Tech.

After the bench trial, the trial court found that World Tech owed Manager "a balance of" $178,156.51 "on its account," but it ordered Manager take nothing on its breach-of-contract counterclaim. In its final judgment, the trial court found in favor of World Tech on its claims for breach of contract, conversion, and violation of the fraudulent lien statute. World Tech elected to recover on its fraudulent-lien-statute claim.

Accordingly, the trial court awarded World Tech $328,692.26 in actual damages. It also awarded World Tech $657,384.52 in exemplary damages but made no findings of fact to support the award of exemplary damages. The trial court reiterated its declaration that Manager did not possess a valid mechanic's lien against

the aircraft and that its mechanic's lien was "null and void."  Additionally, the trial court awarded World Tech $178,280.48 in attorney's fees, conditional appellate attorney's fees, costs, and pre- and post-judgment interest.

## Sufficiency of Damages Evidence

In its first issue, Manager argues that the evidence is legally insufficient to support the trial court's findings that World Tech was entitled to damages because World Tech did not satisfy its burden to show lost profits.

When a party appeals from a judgment rendered after a bench trial, the trial court's findings of fact have the same weight as a jury's verdict, and we review the sufficiency of the evidence supporting those findings by using the same standards we use to review jury verdicts.  *See Tex. Outfitters Ltd., LLC v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019); *see also BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002).  When, as here, there is a complete reporter's record, findings of fact are not conclusive, and they are binding only if supported by the evidence.  *See BMC Software*, 83 S.W.3d at 795; s*ee also HTS Servs., Inc. v. Hallwood Realty Partners, L.P.*, 190 S.W.3d 108, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

When a party attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof at trial, it must demonstrate that no evidence supports the finding.  *See Exxon Corp. v. Emerald Oil & Gas, Co.*, 348

S.W.3d 194, 215 (Tex. 2011). We will sustain a legal-sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact; (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). We consider the evidence in the light most favorable to the finding and indulge every reasonable inference that would support it. *Id.* at 822.

We are mindful that the trial court, as the fact finder in a bench trial, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See City of Keller*, 168 S.W.3d at 819; *McKeehan v. Wilmington Sav. Fund Soc'y, FSB*, 554 S.W.3d 692, 698 (Tex. App.—Houston [1st Dist.] 2018, no pet.). Thus, the trial court may choose to believe one witness and disbelieve another. *McKeehan*, 554 S.W.3d at 698; *see also City of Keller*, 168 S.W.3d at 819. It is the fact finder's role to resolve conflicts in the evidence, and we may not substitute our judgment for that of the fact finder. *See McKeehan*, 554 S.W.3d at 698.

Lost profits are the measure of damages for the loss of net income to a business. *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002); *Univ. Gen. Hosp., LLC v. Prexus Health Consultants, LLC*, 403 S.W.3d 547, 551 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *see also Mid Continent Lift & Equip., LLC v. J. McNeill*

19

*Pilot Car Serv.*, 537 S.W.3d 660, 665 (Tex. App.—Austin 2017, no pet.) (lost profits are defined as "the net of income or revenues from a business activity less the expenses incurred in that activity"). "[A] plaintiff seeking lost profits damages bears the burden of providing a single complete calculation of lost profits, which reflects revenue from lost business activity less expenses that would have been attributable to that activity." *Prexus Health Consultants*, 403 S.W.3d at 555; *see also Merchants Grp., Inc. v. OM & Dev Shah, LLC*, No. 01-19-00294-CV, 2021 WL 1537517, at *10 (Tex. App.—Houston [1st Dist.] Apr. 20, 2021, no pet.) (mem. op.) (explaining there is more than one correct method to calculate lost profits, but recovery of lost profits must be predicated on one complete calculation).

"To be recoverable, lost profits must be proven by competent evidence with reasonable certainty." *Texaco, Inc. v. Phan*, 137 S.W.3d 763, 771 (Tex. App.—Houston [1st Dist.] 2004, no pet.). Recovery of lost profits does not require that the loss be susceptible to exact calculation. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). But the injured party must do more than show that it suffered some lost profits. *Id.* Opinions or estimates are competent evidence of lost profits if based on objective facts, figures, or data from which the amount of lost profits can be ascertained. *See Szczepanik v. First So. Tr. Co.*, 883 S.W.2d 648, 649 (Tex. 1994).

Mere evidence that the plaintiff expected to make a profit within a certain range at a certain time is legally insufficient to show lost profits. *See id.* at 650. Further, lost profits must be based on net profits, not gross revenues. *Phan*, 137 S.W.3d at 771; *see also Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 864 (Tex. 2017) (evidence of lost "contracts generating revenue for [party] is not enough to establish that [party] lost profits").

Manager argues that World Tech's evidence of actual damages is legally insufficient because World Tech was required to show net profits but instead showed only lost revenues from its inability to use the aircraft for charter flights. Here, Kouyoumjian testified that he understood that under World Tech's agreements with Manager, World Tech would be "guarantee[d] 275 hours with the charter revenue at [$]3740 an hour." World Tech's expert, Long, testified as to the methodology he would use to calculate the net charter revenue that would be paid to the aircraft owner. He stated that he would "take the gross revenue and then subtract the cost of operations, estimates for the fuel and maintenance and engine reserves to then come up with . . . a net revenue that would be provided to the owner." But the trial court sustained Manager's objection to Long testifying about those amounts because his estimates were not based on any objective data. Thus, Long was not permitted to testify to any estimated amounts for those costs and expenses. *See Holt Atherton Indus.*, 835 S.W.2d at 84 ("At a minimum, opinions or estimates of lost profits must

be based on objective facts, figures, or data from which the amount of lost profits can be ascertained.").

World Tech adduced no other evidence of its costs and expenses at trial. Absent evidence of the expenses that World Tech incurred in connection with the charter-related use of the aircraft, there is no evidence of net lost profits. *See Phan*, 137 S.W.3d at 771 (explaining net profits cannot be calculated without accounting for all expenses incurred in carrying on business).

Accordingly, we hold that there is legally insufficient evidence of actual damages to support the trial court's final judgment under any of the theories of recovery advanced by World Tech. Further, because exemplary damages are not available without proof of actual damages, we hold that the trial court erred in awarding World Tech exemplary damages as well. *See Hancock v. Variyam*, 400 S.W.3d 59, 71 (Tex. 2013); *Gilbreath v. Horan*, 682 S.W.3d 454, 517 (Tex. App.—Houston [1st Dist.] 2023, pet. denied) (plaintiff may not recover exemplary damages unless it also establishes actual damages).

We sustain Manager's first issue.

## Validity of Lien and Fraudulent Lien Claim

In its third issue, Manager argues that the trial court erred in granting World Tech's motion for partial summary judgment and granting its request for declaratory relief declaring that Manager did not possess a valid lien because "[n]one of [World

22

Tech's] asserted grounds justified the trial court's order."  In a portion of its second issue, Manager argues that the trial court erred in concluding that World Tech was entitled to recover on its claim against Manager for violation of the fraudulent lien statute because "[t]he evidence conclusively established [that] Manager had a valid lien."[4]

We review the trial court's decision to grant summary judgment as to the validity of the lien de novo.  *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003).  In conducting our review, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor.  *Valence Operating*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215.  If a trial court grants summary judgment without specifying the grounds for granting the motion, we must uphold the trial court's judgment if any of the asserted grounds are meritorious.  *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 148 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

---

[4]     The remaining portion of Manager's second issue challenges the legal sufficiency of evidence of liability on World Tech's claims for conversion and breach of contract.  Our disposition of Manager's first issue makes it unnecessary to address the liability issues for those claims, but we consider the challenge to the trial court's finding of liability under the fraudulent lien statute because it also provides for the imposition of a $10,000 penalty in lieu of actual damages.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 12.002(b)(1)(A).

To prevail on a matter-of-law summary-judgment motion, the movant must establish that no genuine issue of material fact exists and the trial court should grant judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). When a plaintiff moves for summary judgment on its own claim, it must conclusively prove all essential elements of its claim. *U.S. KingKing, LLC v. Precision Energy Servs., Inc.*, 555 S.W.3d 200, 212 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *Cleveland v. Taylor*, 397 S.W.3d 683, 696–97 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).

The non-movant has no burden to respond to a motion for summary judgment unless the movant conclusively establishes each element of its cause of action as a matter of law. *Rhône–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222–23 (Tex. 1999). If the movant meets its burden, the burden shifts to the non-movant to respond with evidence raising a genuine issue of material fact that would preclude summary judgment. *See Siegler*, 899 S.W.2d at 197; *Transcont'l Ins. Co. v. Briggs Equip. Tr.*, 321 S.W.3d 685, 691 (Tex. App.—Houston [14th Dist.] 2010, no pet.). The evidence raises a genuine issue of fact if "reasonable and fair-minded fact finders could differ in their conclusions in light of all of the summary-judgment evidence." *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

In its partial-summary-judgment motion, World Tech argued that Manager's alleged lien was invalid because it was improperly filed under Texas law, Manager

24

was a management company and did not actually perform maintenance or provide fuel, and Manager's alleged lien was not notarized before filing. Manager filed its lien under Texas Property Code section 70.301(a), which provides:

> A person who stores, fuels, repairs, or performs maintenance work on an aircraft has a lien on the aircraft for:
>
> > (1) the amount due under a contract for the storage, fuel, repairs, or maintenance work; or
> >
> > (2) if no amount is specified by contract, the reasonable and usual compensation for the storage, fuel, repairs, or maintenance work.

TEX. PROP. CODE ANN. § 70.301(a). According to World Tech, this provision of Texas law "[did] not apply to Manager's alleged lien" because (1) "there [wa]s no nexus between the [p]arties and Texas"; (2) the services provided by Manager were primarily performed in California; and (3) California was World Tech's "principal place of business." World Tech acknowledged that the parties' agreements contained a choice-of-law provision calling for the application of Texas law, but it argued that Manager was not entitled to claim a statutory lien under Texas law because there was no "nexus" between Texas and the parties' relationship "to justify Texas as a proper choice of law for [World Tech's] lien."[5]

---

[5] World Tech's position that there was "no nexus between the parties and Texas" is contradicted by the services agreement's recitation that it was "negotiated and delivered in the State of Texas."

Assuming that World Tech believed the lien should have been filed under California law, though, we note that it did not identify the applicable California statute or, more to the point, any conflict between the laws of Texas and the laws of California as to the requirements for filing the lien. If the applicable laws of the interested jurisdictions do not conflict, there is no need to decide which jurisdiction's law applies. *Vanderbilt Mortg. & Fin., Inc. v. Posey*, 146 S.W.3d 302, 313 (Tex. App.—Texarkana 2004, no pet.); *Vandeventer v. All Am. Life & Cas. Co.*, 101 S.W.3d 703, 711–12 (Tex. App.—Fort Worth 2003, no pet.); *Young Refin. Corp. v. Pennzoil Co.*, 46 S.W.3d 380, 385 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). Texas courts may presume that another state's law is the same as Texas's law absent proof or argument to the contrary. *Coca–Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 685 (Tex. 2006); *Cooper Indus., LLC v. Pepsi–Cola Metro. Bottling Co.*, 475 S.W.3d 436, 441 n.5 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

As authority for its assertion that the Texas lien statute did not apply, World Tech relies on the decision of a federal court in the Eastern District of Virginia, which held that Texas Property Code section 70.301 "applie[d] only with respect to contracts arising under Texas law" and could not "operate to create liens for aircraft fueling and servicing transactions that occur[red] elsewhere." *Westwind Acquisition Co., LLC v. Univ. Weather & Aviation, Inc.*, 668 F. Supp.2d 749, 753 (E.D. Va.

26

2009).  *Westward Acquisition*, though, is inapposite.  Unlike the parties there, Manager and World Tech executed contracts expressly stating that they would "in all respects be governed by, and construed in accordance with, the laws of the State of Texas, including all matters of construction, validity, and performance."  Manager and World Tech thus agreed that their relationship "ar[ose] under Texas law" and would be governed by it.

World Tech also protests that there was no "nexus" between Texas and the parties' relationship to justify the application of Texas law to the lien, relying on Texas authority to argue this choice-of-law issue.  *See ExxonMobil Corp. v. Drennen*, 452 S.W.3d 319, 324 (Tex. 2014) (recognizing "party autonomy rule").  But the choice-of-law rule articulated in *Drennen* does not apply here because Manager and World Tech expressly agreed that their relationship would be governed by Texas law "without giving effect to its conflict of laws provisions."  We see no reason to question the enforceability of this provision of the parties' agreements.  Texas's public policy "strongly favors freedom of contract," and parties "have the right to contract as they see fit as long as their agreement does not violate the law or public policy."  *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 482 (Tex. 2017) (internal quotations omitted).  The undisputed evidence shows that Texas law applied to the agreements, and World Tech did not satisfy its summary-judgment

27

burden to establish that Manager could not properly invoke the Texas fraudulent lien statute.

In its motion for partial summary judgment, World Tech also argued that Manager's lien was invalid because as a management company, Manager did not actually perform maintenance or provide fuel. World Tech relies on its own reading of Texas Property Code section 70.301 that a lien is available to "a person who stores, fuels, repairs, or performs maintenance work on an aircraft" to assert that it means the person must provide those services directly, and thus, section 70.301 does not apply to a management company that only arranges for those services to be provided. *See* TEX. PROP. CODE ANN. § 70.301(a). But the statute contains no such limiting language, and we see no reason to insert this additional restriction in the statute, particularly when Texas courts generally give lien statutes a liberal construction. *See, e.g.*, *Patriot Contracting, LLC v. Shelter Prods., Inc.*, 650 S.W.3d 627, 652–53 (Tex. App.—Houston [1st Dist.] 2021, pet. denied); *see also In re Curry*, 407 S.W.3d 376, 379–81 (Tex. App.—Dallas 2013, orig. proceeding) (appellate court, noting parties did not dispute validity of management company's lien on aircraft, found trial court did not err in signing turnover order allowing management company to retain possession of aircraft).

Further, Manager did not only finance the fuel, repair, and maintenance of the aircraft; it also procured and paid for the materials and services as needed to keep

28

the aircraft operational. And, as Manager pointed out in its summary-judgment response, it directly provided storage facilities for the aircraft. World Tech thus did not meet its burden to prove conclusively that Manager was not entitled to a lien under Texas Property Code section 70.301(a).

As to World Tech's argument that the lien was invalid because it did not comply with the statutory requirement that the statement filed with the FAA be notarized, the plain language of Texas Property Code section 70.303 makes the filing of the lien, and thus its notarization, discretionary. *See* TEX. PROP. CODE ANN. § 70.303 (holder "may record" lien by filing "a verified document" stating name, address, and telephone number of lienholder, amount due for storage, fuel, repairs, or maintenance, complete description of aircraft, name and address of aircraft's owner, and number assigned to aircraft by FAA, if known). Thus, whether Manager correctly filed its lien did not affect whether the lien was valid under Texas Property Code section 70.301(a).

Because none of the legal grounds urged by World Tech supports a finding that Manager's lien was invalid, the evidence is also legally insufficient to support the trial court's finding that Manager filed a fraudulent lien. *See Lyon v. Bldg. Galveston, Inc.*, No. 01-15-00664-CV, 2017 WL 4545831, at *6 (Tex. App.— Houston [1st Dist.] 2017, pet. denied) (mem. op.); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 12.002(a) (requiring plaintiff to prove defendant had "knowledge that

the document" is "a fraudulent lien"). Thus, we hold that the trial court erred in granting World Tech's motion for partial summary judgment, declaring the lien invalid, and granting judgment in favor of World Tech on its claim for violation of the fraudulent lien statute.

We sustain the pertinent portion of Manager's second issue and its third issue.

## Breach-of-Contract Counterclaim

In its fourth issue, Manager argues that the trial court erred in denying its breach-of-contract counterclaim against World Tech because it conclusively proved that it was entitled to recover on that counterclaim.

When a party challenges the legal sufficiency of an adverse finding on an issue on which it bore the burden of proof at trial, that party must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue, and the party may prevail on appeal only if no evidence supports the adverse finding and the contrary position is conclusively established. *See PlainsCapital Bank v. Martin*, 459 S.W.3d 550, 557 (Tex. 2015); *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *see also City of Keller*, 168 S.W.3d at 815–16 (explaining nature of conclusive evidence).

A breach-of-contract claim requires proof of four elements: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the

30

plaintiff as a result of the defendant's breach. *See B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 16 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The breach must be material to render the contract unenforceable against the non-breaching party going forward. *See Mustang Pipeline Co., Inc. v. Driver Pipeline Co.*, 134 S.W.3d 195, 199 (Tex. 2004); *see also Bartush–Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (non-material breaches do not excuse future performance by non-breaching party); *PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 633 (Tex. 2008) (explaining when one party to contract commits material breach, other party is discharged or excused from further performance).

In concluding that Manager breached the agreements, the trial court found that Manager "failed to timely and accurately provide monthly accounting and statements" to World Tech. When World Tech received an invoice from Manager, the agreements required World Tech to pay all or any undisputed portion of the invoice within thirty days. Thus, any delay by Manager in providing an invoice to World Tech merely postponed World Tech's obligation to pay the invoice.

Nothing shows that any delay by Manager in sending an invoice somehow deprived World Tech of an expected benefit of the contract. *See Mustang Pipeline*, 134 S.W.3d at 199. Thus, Manager's delay in sending invoices did not constitute a material breach of the agreements. *See id.*

31

The receipt of an invoice, though, triggered certain obligations for World Tech. World Tech was required to pay any net debit balance shown on an itemized statement in full within thirty days of receipt. If World Tech "ha[d] a bona fide dispute in respect of any of the charges listed" on an invoice, it was required to promptly notify Manager of such dispute, pay any "undisputed amounts within thirty (30) days of receipt," and "negotiate a resolution of the dispute with [Manager] as soon as possible, but no more than ten (10) [b]usiness [d]ays after the expiration of the thirty (30) day period in which to pay undisputed amounts."

The evidence at trial, including Kouyoumjian's own testimony, showed that World Tech did not comply with these obligations. In fact, the evidence is undisputed that World Tech was in breach of its payment obligation by no later than November 2016. It shows that World Tech's account was in arrears beginning in May 2016. Manager invoiced World Tech $45,149.05 on May 16, 2016; $48,863.61 on June 16, 2016; $27,430.08 on July 16, 2016; $76,685.38 on August 16, 2016; and $27,430.08 on September 16, 2016.

By November 2016, World Tech's account had a net "running balance" due of about $240,662. On November 8, 2016, World Tech made a partial payment of $120,000 to Manager but did not dispute any of the charges listed on the invoices that Manager had sent prior to that date.

32

As of April 5, 2017, World Tech had not made a payment on its account with Manager for over six months. Yet, Connelly testified that World Tech did not dispute any specific line item of expense on any of the invoices that Manager sent to World Tech. Manager's Chief Financial Officer Smith, whose department prepared and sent invoices to clients, similarly testified that she was never made aware that World Tech ever disputed any specific line item of any expense on the invoices that her department sent to World Tech. And while Kouyoumjian testified generally that World Tech did not receive accurate invoices from Manager, he did not identify a specific charge on any invoice that World Tech had challenged as inaccurate.

Manager nevertheless continued to perform under the parties' agreements. Manager sent all the invoices it had previously sent to World Tech by March 30, 2017, and World Tech did not dispute that it received them. World Tech likewise did not dispute having received Manager's final two invoices, which were sent to World Tech's counsel in May 2017. In its findings of fact, the trial court found that World Tech still owed Manager "a balance of $178,156.51 on its account (without interest) after credits." As World Tech failed to pay the amount due within the time frame required by the parties' agreements, the evidence conclusively established that World Tech did not comply with such agreements.

We hold that the trial court erred in ordering that Manager take nothing on its breach-of-contract counterclaim.

We sustain Manager's fourth issue.

## Conclusion

We reverse, in part, the judgment of the trial court and render judgment that World Tech take nothing on its claims. We also reverse the trial court's denial of Manager's breach-of-contract counterclaim and render judgment that Manager recover on that counterclaim. We affirm the portion of the trial court's judgment awarding Manager $178,156.51 but amend that portion of the judgment to reflect that such award constitutes Manager's actual damages for its breach-of-contract counterclaim and to include the contractual pre-judgment interest owed on that award. Finally, we reverse the award of attorney's fees in favor of World Tech, order that Manager recover its attorney's fees, costs, and pre-and post-judgment interest consistent with the parties' stipulations, and remand to the trial court for rendition of judgment consistent with this opinion.


Julie Countiss
Justice

Panel consists of Chief Justice Adams and Justices Hightower and Countiss.

34